[CERTIFIED TRANSLATION]

**COMMONWEALTH OF PUERTO RICO**
**COURT OF FIRST INSTANCE**
**SUPERIOR COURT, SAN JUAN PART**

| | |
|---|---|
| DAVID FIGUEROA<br><br>**Petitioner**<br><br>v.<br><br>BOARD OF HOMEOWNERS OF THE EXECUTIVE TOWER CONDOMINIUM, BANCO COOPERATIVO DE P.R., JOHN DOES 1–100<br><br>**Respondents** | CIVIL CASE NO:<br><br><br><br>IN RE: DAMAGES; PETITION FOR ORDER; |

**PETITION FOR ORDER OF PERMANENT INJUNCTION**
*(request for preliminary injunction not included)*

**TO THE HONORABLE COURT:**

Comes now the petitioner, David Figueroa (hereinafter the "Petitioner" or "Figueroa"), through the undersigned legal counsel, and requests a permanent injunction pursuant to 42 U.S.C. § 12188 due to the failure by (i) **BOARD OF HOMEOWNERS OF THE EXECUTIVE TOWER CONDOMINIUM**, (ii) **BANCO COOPERATIVO DE P.R.**, and John Does 1–100 (hereinafter, the "Respondent") to comply with the provisions of Title III of the federal Americans with Disabilities Act, 42 U.S.C. § 12181 et seq. (hereinafter, the "ADA")[1] and violations to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. A permanent

---

[1] The obligations of Title III of the ADA extend to all private entities and commercial facilities that provide services to the public. The obligation imposed by Title III consists of not discriminating in the offering of said services against persons with disabilities in the equal and full enjoyment of the goods, services and facilities, privileges, advantages, or accommodations in any place of public accommodation. The official link provided by the U.S. Government with information about Title II/III of the ADA is: http://www.ada.gov/

injunction, nominal damages[2], compensatory damages, and other remedies are sought under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

### THE PLACE OF PUBLIC ACCOMMODATION AT ISSUE

1.    This action seeks to remedy the unlawful discrimination that is taking place in an established and known place of **public accommodation[3]** in the location that is mentioned below:

THE EXECUTIVE TOWER CONDOMINIUM
ADDRESS: 623 AVENIDA DE LA CONSTITUCIÓN, SAN JUAN, 00918, PUERTO RICO
APPROXIMATE COORDINATES: 18.412531530609616, -66.054206671164

(we will hereinafter refer to this place as the "Property" or the "place of public accommodation").

### NEED FOR THIS ACTION

2.    This Petition for Permanent Injunction is necessary for the following reasons:

a)    The Respondent did not procure the elimination of architectural barriers;

b)    The Respondents have architectural barriers in the place of public accommodation in violation of the ADA and the Accessible Design Guidelines established by the U.S. Department of Justice, which

---

[2] Nominal damages are sought pursuant to the judgement of the United States Supreme Court on March 8, 2021 in Uzuegbunam v. Preczewski, *Uzuegbunam v. Preczewski*, 592 U.S. ____ (2021), 2021 WL 8501016 (March 8, 2021).

[3] The term "public accommodation" or "place of public accommodation", 42 U.S.C. 12181(7), is defined as any private entity the operations of which affect commerce, and the following places are specifically mentioned as examples of places of public accommodation: hotels, motels, inns, restaurants, bars, other establishments serving food or drinks, motion picture houses, theaters, concert halls, stadiums, places of exhibition or entertainment, auditoriums, convention centers, lecture halls, places of public gathering, bakeries, grocery stores, clothing stores, hardware stores, shopping centers, other sales or rental establishments, laundromats, dry-cleaners, banks, barber shops, beauty shops, shoe repair services, funeral parlors, gas stations, offices of accountants or lawyers, pharmacies, insurance offices, professional offices of health care providers, hospitals, other service establishments, public transportation terminals, museums, libraries, galleries, other places of public display or collection, parks, zoos, amusement parks, other places of recreation, nursery schools, elementary, secondary, graduate or postgraduate private schools, universities, other places of education, day care centers, senior citizen centers, homeless shelters, food banks, adoption agencies, other social service center establishments, gymnasiums, health spas, bowling alleys, golf courses, and other places of exercise or recreation.

may be accessed through the following official link: https://www.ada.gov/2010ADAstandards_index.htm

c) The Petitioner visited the place of public accommodation and personally encountered architectural barriers related to his disability.

d) The Petitioner (i) is at imminent risk of encountering the architectural barriers and (ii) it would be futile for him to return to the place of public accommodation at this time, since it would entail a risk to his personal safety or would be equivalent to submitting himself to an unpleasant, humiliating, and discriminatory condition or situation.

e) The Petitioner's intention at this time is to be able to enjoy the goods, privileges, [and] services that are available at the place of public accommodation once all of the architectural barriers are completely removed. However, the Petitioner reserves the right to return to the place of public accommodation at any time before the architectural barriers are removed, even if it might entail submitting himself to dangerous or discriminatory conditions, in order to seek out, identify, and denounce the discrimination.

**THE PETITIONER**

3.      The Petitioner is a person with a physical or mental disability that substantially limits several of his main daily activities. **The physical disability is:** quadriplegia or tetraplegia (a lesion to the spinal cord in which the patient may suffer paralysis.) These conditions or "impairments" substantially limit Mr. Figueroa. This physical disability substantially limits (in comparison with the majority of the population) at least one of the following daily activities: walking, standing, running, jumping, dancing, lifting objects, bending, and all activities

related to the abovementioned disability.

4.     The Petitioner has a "disability" as defined by the ADA. 42 U.S.C. § 12102(l)(A).

5.     As mentioned before, the Department of Transportation and Public Works of the Government of Puerto Rico (DTOP, Spanish acronym) has issued Mr. Figueroa a removable sign indicating that he is a disabled person, so that the Petitioner may use it to park in spaces identified as accessible or "for persons with disabilities". The removable sign is not required to be used in a specific vehicle and it does not have to be used in a motor vehicle registered in the Petitioner's name. The Petitioner has the right to use the removable sign issued by the DTOP in any vehicle, whether the vehicle belongs to him, a family member, or a friend, or in a vehicle in which he simply happens to be riding. The Petitioner has the legal right to use parking spaces designated as accessible or "for persons with disabilities" in this jurisdiction, regardless of the motor vehicle in which he is traveling.

**THE RESPONDENTS**

6.     The Respondents are the following natural persons or legal entities:

  i.     BOARD OF HOMEOWNERS OF THE EXECUTIVE TOWER CONDOMINIUM: This legal entity is the owner, lessor, lessee, or operator of the Property that is identified in the first paragraph of this Petition.

  ii.     BANCO COOPERATIVO DE P.R.: This legal entity is the owner, lessor, lessee, or operator of the Property that is identified in the first paragraph of this Petition.

  iii.     John Does 1-100: These unknown natural or legal persons are owners, lessors, lessees, or operators of the Property

that is identified in the first paragraph of this Petition. Since their identity is unknown at this time, the Petition will be amended to include them in this civil suit. In this Petition, the term "Petitioner" [sic] also includes all the unknown respondents identified with the fictitious name "John Does 1-100".

## JURISDICTION AND COMPETENCE

9.      In the event that this civil suit were removed to the United States District Court, in rem jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3) and (a)(4) for violations of the ADA.

10.     The Court of First Instance has original jurisdiction to rule on disputes that arise under Title III of the Americans with Disabilities Act and the Rehabilitation Act.

11.     This civil action has been filed before the judicial forum with competence, inasmuch as the Property in controversy is located in this judicial region.

## FACTS

12.     The Property is a place of public accommodation, as defined by the ADA, 42 U.S.C. 12181(7) and it is a place that is open to the public, the operation of which affects commerce. The Property is not residential in nature, it is not a private club, and it is not a church.

13.     The Petitioner is a resident of Puerto Rico. His address is: Carr 853 km 7.8 Bo. Barrazas Carolina, Puerto Rico. Postal address: HC2 BOX 14800 CAROLINA, PR 00987. Telephone: (787) 980-7793.

14.     The Petitioner visited the Property on or around May 20, 2021, and found barriers that interfered with his ability to use and enjoy the goods, services, privileges, and accommodations offered at the Property.

15.     Additionally, and separately from the above, the Petitioner

invokes standing as a person who intends to return to the Property expressly to seek out and identify any architectural barriers existing in the Property in the future. He intends to seek out and identify any architectural barriers in order to: (1) denounce additional barriers that may be found in the future; (2) check for compliance with or violations of any order that the court may issue regarding the elimination of architectural barriers. It is affirmatively alleged that [the Petitioner has] standing as a civil rights tester, as alleged in this paragraph, in accordance with the binding precedent in this jurisdiction established in <u>Suarez-Torres v. Panadería y Repostería España, Inc.</u>, No. 18-1618 (1st Cir. Feb. 17, 2021), where it was established that it is not necessary for a person with disabilities to be a "bona fide client or customer" of the place of public accommodation to have standing to claim rights under the ADA. A civil rights tester is a person who has the specific intention to seek out, identify, and denounce discrimination, even if it entails submitting to said discrimination or to unsafe conditions. In <u>Suarez-Torres v. Panadería y Repostería España, Inc.</u>, the First Circuit unequivocally established the existence of standing as a tester by ruling that:

> Panadería España contends that, as testers, appellants are unable to establish an injury because their only motivation in visiting the bakery was to detect ADA violations.

> We have not previously addressed the impact of a plaintiffs status as a "tester" on her ability to establish standing under the ADA. However, the circuits that have considered this issue have uniformly concluded that an individual's "tester" status does not defeat standing. As the Eleventh Circuit explained in Houston v. Marod Supermarkets, Inc., the ADA guarantees the right of any individual to be free from "disability discrimination in the enjoyment of [public places of accommodation] regardless of [the individual's] motive for visiting the facility." 733 F.3d at 1332. Congress did not limit the protections of the ADA to "clients or customers" or otherwise impose a bona fide visitor requirement. Id. at 1332-34 (contrasting 42 U.S.C. §§ 3604(a), and 12182(b)(T)(A)(iv), which do contain such requirements). Hence, such limitations should not be read into the ADA. Id. We agree with this analysis. **Accordingly, we conclude that appellants' status as testers does not defeat standing.**

Suarez-Torres v. Panadería y Repostería España. Inc,. No. 18-1618 (1st Cir. Feb. 17, 2021) (internal citations omitted)(emphasis ours).

16.    This petition incorporates and adopts **APPENDIX A,** a supplementary allegation resulting from an investigation conducted by Mr. Figueroa during his last visit to the Property. The images presented below illustrate the historical condition of the facilities of the Executive Tower Condominium in a brief cause–effect relation.

17.    This petition incorporates and adopts **APPENDIX B,** a supplementary allegation resulting from an investigation conducted by Mr. Figueroa during his last visit to the Property. The images presented below illustrate the historical condition of the facilities of the Executive Tower Condominium in a brief cause–effect relation.

18.    This petition incorporates and adopts **APPENDIX C,** a supplementary allegation which includes an official document issued by the Puerto Rico Department of Transportation and Public Works (DTOP), which serves as evidence that Mr. Figueroa is a beneficiary of the privileges afforded to people with a disability for the purposes of parking, discounts, express checkout lines for the disabled, among others.

19.    In his capacity as a bona fide customer, the Petitioner has felt, and to this day continues to feel, dissuaded or discouraged from visiting the Property because he is aware that there are unlawful barriers that limit and interfere with his access to same. The Petitioner knows that it would be useless to face these barriers because facing them implies submitting himself to a humiliating, discriminatory, and dangerous situation. All the barriers described herein are directly related to the Petitioner's disability and interfere with his full and equal access. However, despite feeling dissuaded, he intends to return in order to seek out, identify, and denounce the discrimination that exists at said Property.

20.    Based on his personal observations, and based on his experience as a person with limitations who has seen hundreds of accessible and inaccessible places throughout his lifetime, the Petitioner affirmatively alleges that the following architectural *design* barriers related to his disability and mobility limitations are in place at the Property:

**Parking. Access Route and Entrance**

a.    Regarding the access route, there is no access route from the parking spaces or the sidewalk to an accessible entrance without steps. ADAAG 1991 § 4.3; ADAAG 2010 § 206.2.1. Possible solutions: add a ramp; modify the slope so it is 1:20; add a platform lift.

b.    Regarding parking spaces, the required number of accessible parking spaces are not available. ADAAG 1991 § 4.1.2; ADAAG 2010 § 208.2. Possible solution: reconfiguring the parking lot using paint.

c.    The parking lot does not receive proper maintenance in order to be kept in "operable condition", in violation of 28 C.F.R. § 36.211(a). For example, the parking area has been maintained poorly and inconsistently, and not in compliance with the applicable standards.

d.    Regarding parking spaces, the requirement that at least one parking space meet the technical specifications and dimensions of the "van" category is not met.[4] ADAAG 1991 §4.1.2 (b); ADAAG 2010 § 208.2. The requirement that

---

[4]Neither the ADAAG nor state legislation require that a person with disabilities have a van or truck in order to park in said parking spaces classified by the ADAAG as "Van" spaces. There must be, and there is a right to use, all the accessible parking spaces required by the ADAAG.

one sixth of the accessible parking spaces have the "van" category dimensions is also not met. Id. Possible solution: reconfiguring the parking lot using paint.

e.   The configuration and dimensions of the parking spaces is substantially inconsistent with the requirements of the applicable standards. ADAAG 2010 § 502.2, 502.3. Possible solutions: reconfiguring the parking lot using paint.

f.   The configuration and dimensions of the spaces adjacent to the parking spots is substantially inconsistent with the requirements of the applicable standards. ADAAG 2010 § 502.2, 502.3., 503.3.3. Possible solutions: reconfiguring the parking lot using paint.

g.   The slope in the parking spaces and the spaces adjacent to the parking spaces is inconsistent with the requirements of the applicable standards, since the inclination is greater than 1:48 in every direction. ADAAG 2010 § 502.4. Possible solutions: level the surfaces; relocate parking spaces in compliance with the guidelines for the placement of accessible parking spaces.

h.   The spaces adjacent to the parking spaces do not connect to an accessible route. ADAAG 2010 § 502.3. Possible solutions: reconfiguring the parking spaces so that the access aisle connects to the accessible route.

i.   The parking spaces are not identified with the international accessibility symbol. ADAAG 2010 § 502.3. Possible solutions: place all the regulatory signage in all the accessible parking spaces. The signage must be placed at the height and in the position required by regulation.

j.   The positioning of the signage of the parking spaces is substantially inconsistent with the applicable standards. ADAAG 2010 § 502.6. Possible solutions: placing signage at the height and in the position required by regulation.

k.   None of the parking spaces has the "van" signage required by the applicable standards. ADAAG 2010 § 502.6. Possible solutions: placing signage in all the accessible parking spaces and at the height and in the position required by regulation.

l.   The accessible parking spaces are not located in the closest accessible route to the accessible entrance. ADAAG 2010 § 502.6. Possible solution: reconfiguring the parking spaces.

m.   The access route to the accessible entrance from the parking spaces is not solid, stable, and tends to be slippery. ADAAG 2010 § 302.1. Possible solutions: repair uneven pavement; repair protuberances and holes; replace the existing surface with asphalt or other material.

n.   The access route to the accessible entrance from the parking spaces is not 36" wide. ADAAG 2010 § 403.5.1. Possible solutions: remove objects that make the space smaller; expand the width of the access route

o.   The access route to the accessible entrance has ramps with a slope that is too steep, which is substantially inconsistent with the applicable standards. ADAAG 1991 §§ 4.8.1, 4.8.2; ADAAG 2010 §§ 403.3 (cross slope and running slope). Possible solution: reconfiguring so that the slope is 1:20.

p.   The access route has curb ramps with a configuration and dimensions that are substantially inconsistent with

the requirements of the applicable standards. ADAAG 1991 §§ 4.7.1, 4.7.2, 4.7.2.3, 4.7.4, 4.7.5, 4.7.6, 4.7.9, 4.7.10; ADAAG 2010 §§ 402.2, 406.1, 405.2, 406.1, 405.3, 405.5, 406.4, 406.3). Possible solutions: modifying the ramp and adjusting it to the regulatory requirements.

q.  Regarding the **access route,** the route from where it starts at the parking spaces to the accessible entrance has sections with an incline greater than 1:20 (which means that that incline is considered a ramp for purposes of the ADAAG), but the existing physical configuration does not comply with the requirements applicable to **ramps** in a manner that is substantially inconsistent with the applicable standards. ADAAG 1991 §§ 4.7.1, 4.7.2, 4.7.2.3, 4.7.4, 4.7.5, 4.7.6, 4.7.9, 4.7.10; ADAAG 2010 § 405.5 (width of ramp) 405.4 (unstable ramp surface), 405.2 (ramp incline), 405.7.2, 405.7.3 (ramp landing), 405.7.4 (60" x 60" space for turning), 405.7.4 (handrail required in ramp with elevation greater than 6"), 505.4 (height of ramp rail), 505.6 (obstructions at the top of the ramp rail); 505.7.1 (diameter of circular handrail is not between 1 1/4" and 2"), 505.7.1 (non-circular handrail does not have a perimeter between 4" and 6 1/4"), 505.10.1 (handrail does not extend 12" beyond top and bottom ramp level). Possible solutions: altering the handrail; replacing the handrail; reconfiguring the ramp rail; adjusting the height of the ramp rail; installing a ramp rail; increasing the landing space or relocating the ramp.

r.  The entrance does not comply with the applicable regulatory requirements. As for the inaccessible entrances, there is no signage on them that indicates the location of the accessible entrance. ADAAG 2010 § 216.6 There are accessible and inaccessible entrances but the

accessible entrances are not identified by the international accessibility symbol. ADAAG 2010 § 216.6. Possible solutions: make all entrances accessible and/or place the signage required by the applicable standards.

s. The entrance door is equipped with parts that cannot be operated with one hand and/or require squeezing, pinching or a twisting of the wrist. ADAAG 2010 § 404.2.7. Possible solutions: replace the parts of the entrance door.

**Access Inside the Property: Access to Goods and Services**

t. The hallways and common areas of the Property lack a space of at least 36" to allow for adequate mobility inside the Property, which is substantially inconsistent with the applicable standards. ADAAG 2010 § 403.5.1 (see image below). Possible solutions: relocating objects to make room. For its persuasiveness and references to applicable standards, see Lieber v. Macy's West, Inc., 80 F. Supp. 2d 1065 (N.D. Cal. 1999) (a case that discusses the applicable standards for the placement of merchandise and objects inside the famous Macy's Union Square store in San Francisco, California.[5] The main purpose of the regulations is to ensure available spaces for people with disabilities to have equal opportunity to move throughout the business.)

---

[5] The area owes its name to the fact that it was a meeting place in support of the Union Army during the Civil War. Today, the plaza is surrounded by department stores and gift stores for locals and the thousands of tourists who visit the Bay Area in San Francisco.



## Access to Restrooms in the Property

u.   The inaccessible [sic] **restrooms** lack the **signage** required by the applicable standards. ADAAG 2010 §216.8, 206.2.4. Possible solutions: placing signage at the correct height and position. The signage must also comply with the requirements for it to be accessible to persons with visual disabilities.

v.   There is no access route to an accessible restroom. ADAAG 2010 § 206.2.4. Possible solutions: establish an unobstructed route to the restroom.

w.   A restroom is available for a **single user at a time**, and the door **swings inwards**, but the area next to the toilet does not leave a space of 30" x 48" adjacent to the door. ADAAG 2010 § 603.2.3. Possible solutions: modify the door so it swings outwards (if this can be done without violating other standards); expand the interior of the bathroom; reposition the objects in the bathroom; reconfigure the bathroom to maximize the space.

x.   Regarding the sink, **the space around the sink** is substantially inconsistent with the applicable standards. ADAAG 2010 § 606.2. Possible solutions: expanding the space around the sinks; relocating objects that can be moved.

y.   Regarding the sink, **the space under the sink** is

substantially inconsistent with the applicable standards. ADAAG 2010 § 306.2. Possible solutions: making space under the sinks; repositioning the sink; replacing the sink with an accessible sink.

z.  Regarding the sink, the height of the sink is substantially inconsistent with the applicable standards. ADAAG 2010 §§ 606.3, 606.3.3, 306.3.3 (height in the space of the foot area). Possible solutions: repositioning the height of the sink; replacing the sink.

aa.  Regarding the sink, the bottom part of this sink is not configured to **prevent contact with the objects under the sink**. ADAAG 2010 § 605.5. Possible solutions: modifying the area under the sink so that there is no contact between legs or knees and the objects under the sink.

bb.  Regarding the sink, the configuration of the faucet does not allow for it to be operated without having to push hard, twist, or turn the wrist. ADAAG 2010 § 606.4. Possible solutions: replacing the faucet.

cc.  Regarding the area of the toilet, **the center of the toilet is far away from the side wall**, which is substantially inconsistent with the applicable standards. ADAAG 2010 § 604.2. Posible solutions: relocate the toilet.

dd.  Regarding the area of the toilet, **the space provided around the toilet** is substantially inconsistent with the applicable standards. ADAAG 1991 § 4.22; ADAAG 2010 § 604.3.1, 604.8.1.1. Possible solutions: expanding the restrooms; moving objects to make room.

ee.  Regarding the area of the toilet, **the height of the toilet** measured from the surface is substantially inconsistent with the applicable

standards. ADAAG 2010 § 604.4. Possible solutions: adjusting the toilet height; replacing the toilet.

ff.   Regarding the area of the toilet, the existing configuration on the wall next to and behind the toilet is substantially inconsistent with the applicable standards. ADAAG 2010 §§ 604.5.1, 609.4., 609.3, 604.5.2, 609.4, 609.6.

gg.   Regarding the toilet, **the configuration of the toilet flush control** is substantially inconsistent with the applicable standards. ADAAG 2010 § 604.6 (height of flush control), 604.6 (location of flush control). Possible solutions: relocating the flush control.

hh.   Regarding the area of the toilet, **the positioning of the toilet paper dispensers and of the toilet paper** is substantially inconsistent with the applicable standards. ADAAG 2010 §§ 604.7, 604.7, [sic] 604.7 [sic]. Possible solutions: reconfiguring the position of the paper and paper dispensers.

ii.   Regarding the handrail surrounding the toilet, both next to and behind the toilets, the existing configuration of the side grab bar and the rear grab bar is substantially inconsistent with the standards applicable to handrails. ADAAG 2010 §§ 604.5.1, 609.4., 609.3, 604.5.2, 609.4, 609.6. Possible solutions: placing and positioning handrails to be consistent with the referenced standards.

21.   The barriers identified in the preceding paragraph are merely those of which the Petitioner is personally aware of, based on his experience and common sense as a person with disabilities, not based on scientific or expert evidence. All of the barriers in the Property, including those that were found and

others that have yet to be found as of this time, are the cause of the Petitioner's legal damages; that is, the lack of full, free, and spontaneous access to the Property. Thus, it is the intention of the Petitioner to use discovery mechanisms to seek out, identify, and point out all architectural barriers related to the Petitioner's disability, so that there may be full and equal access to the Property. After identifying the barriers, the Petitioner intends to ask the Court to amend the allegations in order to adapt them to the discovered evidence related to the ADAAG violations that are yet unknown.

22.     The Petitioner has been discouraged, and is currently discouraged, from visiting the Property because he knows that the goods, services, accommodations, privileges, advantages, and facilities of the Property cannot be accessed without the Petitioner once again facing discrimination. The Petitioner is aware of the goods and services offered at the Property and will return to the Property once the barriers are eliminated.

23.     The Respondents knew, or should have known, that the Property was and is inaccessible; that the conditions of the Property violate federal law and interfere with (or deny) access by persons with disabilities. Additionally, the Respondents have the financial resources to eliminate these barriers from the Property (without much difficulty or expense), and to make the Property accessible to the Petitioner. To date, however, the Respondents refuse to eliminate said barrier.

24.     The Respondents have had and enjoyed enough control and authority to modify the Property to eliminate barriers and comply with the applicable federal regulations. The Respondents have not eliminated said barriers and have not modified the Property to comply with the applicable accessibility standards. The Respondents have intentionally kept the Property in its current state and intentionally refrained from altering the Property for it

to comply with the accessibility standards.

25.     The Petitioner affirmatively alleges that the continuous presence of barriers at the Property is so obvious and open that it reflects the discriminatory intent of the Respondents. The nature of the deviations from the federal standards do not suggest a failure to comply with the regulations due to mere negligence or human error. The existing noncompliance is so substantial that it is obvious to a casual observer of average intelligence with no expertise regarding the accessible design standards or without experience with architectural barriers because he or she does not have a disability. This is why the Petitioner believes, and therefore affirmatively alleges, that the discriminatory intention includes a conscious and pondered refusal to adhere to relevant construction standards; contempt towards the construction plans and permits issued for the Property; a conscious decision to maintain the architectural design (as it currently stands) at the Property, [and] the decision to not eliminate the architectural barriers [and] to keep the Property in a state of noncompliance driven by profit. It is affirmatively alleged that The Respondents have sought to engage in unfair competition with their competitors by not investing money in complying with the federal mandate, even though their competitors do have to invest in compliance, which affects other financial factors. The architectural barriers at the Property are not isolated (or temporary) interruptions in access due to maintenance or repair work.

26.     Based on the Respondents' historical noncompliance with the ADAAG, the Petitioner believes, and therefore alleges, that the Respondents have no internal policies, procedures, or documents related to efforts to ensure compliance with the ADA at the Property.

[CERTIFIED TRANSLATION]

**FIRST CAUSE OF ACTION**
**Americans with Disabilities Act of 1990**

27.   The Petitioner herein incorporates the allegations contained in the preceding paragraphs.

28.   Title III of the ADA essentially provides that no individual shall be treated unequally for reason of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who is an owner, lessor, lessee, or operator of a place of public accommodation. 42 U.S.C. § 12182 (a).

29.   The Respondents discriminated against the Petitioner by denying him the full and equal enjoyment of and access to the goods, services, privileges, and accommodations of the Property during each visit and each time that the Petitioner decided not to visit the place.

30.   The ADA sets forth different standards depending on when the physical structure was built and whether the facility has been altered since January 26, 1992. 28 CFR §§ 36.401, 36.402. Properties "existing" prior to January 26, 1992, must eliminate barriers that prevent access by persons with disabilities when the elimination of same is "readily achievable". 42 LJ.S.C. § 12182 (b) (2) (A) (iv); 28 CFR § 36.304. Structures designed and built to be occupied for the first time after January 26, 1993 must be accessible to persons with disabilities, unless the entity is able to show that it is "structurally impracticable". 42 USC § 12183 (a). Finally, alterations after January 26, 1992, must be made to ensure that, to the "maximum extent feasible", the altered portions of the facilities are

accessible. 28 CFR §36.402 (a) (l).

31.    The design standards, ADAAG, were first published in 1991 and are codified in 28 CFR Part 36, Appendix A ("1991 ADAAG"). The most recent ADA design standards were first published in 2010 and codified in 28 CFR Part 36, Subpart D ("2010 ADAAG"). Both standards can be found at www.ada.gov. All new constructions and modifications begun on or after March 15, 2012, must comply with the 2010 ADAAG.

32.    The Petitioner believes that the Property was designed to be occupied for the first time after January 26, 1993. See 28 CFR § 36.401.

33.    The Petitioner believes that the Property is located in a place that was built after January 26, 1993. See 28 CFR § 36.401. See 28 CFR § 36.401.

34.    The Petitioner believes that the Property was "altered" after January 26, 1993. The term "altered" or "alterations" includes, but is not limited to, remodeling, renovation, rehabilitation, historic restoration, changes or rearrangement of structural parts or elements, changes or rearrangement of the configuration of walls and changes in the counters, tables, or objects inside the Property.

35.    Alternatively, if the Property was not designed and built to be occupied for the first time after January 26, 1993, the Property is deemed an existing facility, in which case there is an obligation to eliminate architectural barriers that affect persons with disabilities to the extent that the elimination of said barriers is "readily achievable". 42 USC § 12182 (b) (2). The ADA establishes that, when evaluating whether the elimination of barriers

is "readily achievable", the factors to be considered include the "resources of the facility", 42 USC § 12181 (9) (b), which include "the overall financial resources of any parent corporation or entity", 28 CFR § 36.104. If the Respondents allege a lack of financial resources as an affirmative defense to excuse their noncompliance, the Petitioner does not accept said pretexts and intends to use discovery mechanisms in accordance with 28 C.F.R. § 36.104. § 36.104.

### FAILURE TO ELIMINATE BARRIERS IN AN EXISTING FACILITY

36. The ADA specifically prohibits not eliminating the architectural barriers in existing facilities when such elimination is readily achievable. 42 USC § 12182 (b) (2) (A) (iv); 28 C.F.R. § 36.104.

37. When an entity is able to demonstrate that the elimination of a barrier cannot be readily achieved, said entity must make sure that the goods, services, privileges, and accommodations are made available through alternative mechanisms, if said methods are readily achievable. § 12182 (b) (2) (A) (v).

38. In this regard, the Petitioner hereby alleges that the Respondents can readily eliminate the architectural barriers in the Property without much difficulty or expense, and that the Respondents violate the ADA by failing to eliminate said barriers when they could and can readily do so.

39. Alternatively, if it is not "readily achievable" for the Respondents to eliminate the architectural barriers, the Respondents violated the ADA by failing to make their services available through alternative methods that were readily achievable.

### FAILURE TO DESIGN AND BUILD
### AN ACCESSIBLE FACILITY

40.     The Property was designed and built (or both) after January 26, 1992 – activating the accessibility requirements of Title III of the ADA and the regulations established by the U.S. Department of Justice.

41.     The Respondents violated the ADA by designing and building (or both) the Property in a way that was not easily accessible to the public with physical disabilities, including the Petitioner, when doing so was structurally practical.

### FAILURE TO MAKE AN ALTERED FACILITY ACCESSIBLE

42.     The Petitioner believes, and therefore affirmatively alleges, that the Property has been altered (as the term "alteration" is defined by §§ 202.1, 202.3, 202.4) after January 26, 1992. 28 CFR §36.403; 49 CFR §37.43.

43.     The ADA also requires that facilities be altered to be easily accessible to persons with disabilities to the maximum extent feasible. 42 U.S.C. §12183 (a) (2).

44.     The Respondents altered the Property in a way that violated the ADA and that made it not easily accessible to the public with physical disabilities, including the Petitioner.

### NON-STRUCTURAL BARRIERS:
### POLICIES AND PROCEDURES

45.     The ADA also requires making reasonable modifications in policies, practices, or procedures, when necessary to provide equal access to the services, goods, privileges, or accommodations to persons with disabilities, unless the entity is able to demonstrate that making said modifications would fundamentally alter the nature thereof. 42

USC§ 12182 (b)(2)(A) (ii).

46.   In this regard, the Respondents violated the ADA by failing to make reasonable modifications to its policies, practices, or procedures at the Property, when said modifications are necessary (without fundamentally altering the nature of the place of public accommodation) to allow for equal access to their goods, services, facilities, or accommodations.

47.   The Respondent [sic] alleges that the failure to eliminate barriers has been conscious, voluntary, and intentional because:

a.   The barriers described herein are clearly visible and tend to be obvious, even to a casual observer;

b.   The Respondents have never acknowledged that complying with the ADA is not a one-time effort, but rather a *continuous* obligation. They have refused to eliminate barriers or create alternatives to provide access;

c.   The Respondents are the owners, lessors, lessees, and/or operators of the Property, and, as such, have control over the conditions of same on a day-to-day basis. The Respondents have had the financial means and capacity to carry out the necessary remediation of the accessibility barriers, but have never been interested in doing so.

d.   Places of public accommodation must be accessible. There is a consequence if they are not: they can face a civil suit, whether initiated by the federal or state government, or by an individual. The Respondents decided to not be proactive and not provide access of their own accord. The Respondents assumed an attitude that can be described as "let us wait, let us not do anything, we'll deal with it if anything happens". The ADA was signed into law on July 26, 1990, by then-President George H.W. Bush after obtaining bipartisan approval. The Respondents

have no excuse for evading their legal obligations, and ignorance of the law does not exempt from its consequences and compliance.

e.  The Respondents ignore the experiences of persons with disabilities who are not able to shop, make personal commercial transactions, visit the doctor, or enjoy themselves as the majority of the people do. There are many places throughout Puerto Rico, such as the Respondents' Property, where the reasonable requirements of the ADA have been ignored. The ADA has the ability to make the difference between daily participation and daily exclusion.

f.  The Respondents also ignore their own experiences in other places of public accommodation. In other words, the Respondents have seen that other places have accessible parking spaces, accessible restrooms, accessible counters, and many other elements that comply [with the standards], therefore they were and are aware of which are the types of access that should be provided to persons with disabilities.

g.  The Respondents know that state and municipal permits are not the equivalent of compliance with the applicable accessibility laws. The Petitioner believes, and therefore alleges, that some of the municipal and state permits that the Respondents possess in order to operate their places of public accommodation expressly state that the permit to operate the business is not equivalent to a certification of compliance with the ADA.

h.  It is believed, and therefore alleged, that there are certifications by architects, engineers, contractors, managers, and government employees certifying to the contrary (potentially fraudulently, subject to investigation and discovery) that the property

complied with the ADA standards, in order to design, build, alter, or operate the Property in controversy in violation of the federal standards and regulations. The Respondents cannot rely on improper acts carried out by themselves or by third parties to justify the continuous operation of a place of public accommodation that violates the applicable federal standards and regulations.

i.   The Respondents [sic] are not required to give written notice about the lack of accessibility. No other civil rights law allows businesses and places of public accommodation to discriminate without consequences until the victims of the discrimination notify the business that the law has been broken. If it were a requirement to give "notice" to the person who violates civil rights, the places of public accommodation would not be proactive in eliminating their architectural barriers. Instead, many would assume an attitude of "better to wait and deal with it if someone says and <u>proves</u> that they notified me about what is obviously wrong".The ADA does not place the burden of action on the persons with disabilities that the law seeks to protect; the duty to be proactive rests with the place of public accommodation. If it were a requirement to notify the establishment, the cost of notifying and proving that notice was given would fall on the person with disabilities, who usually already has limited financial means. For example, a written notice by a layperson would probably result in an extensive litigation and controversy of facts regarding whether said notice was actually served on a person with authority (as if it were a summons), whether it was mailed to the correct address (in a context in which many businesses operate informally and without mailing addresses), or controversies regarding whether the document was actually sent

(forcing the disabled person to assume the cost of mailing letters by certified mail) or interminable controversies regarding whether the notice was sufficient, specific, or complete. Persons with disabilities encounter multiple barriers every day or refrain from going places because they know that they are not accessible (contrary to a person who does not suffer traffic accidents every day); therefore, persons with disabilities, if they were required to provide "notice", would have to invest a lot of money in sending letters by certified mail or hand-delivering said notices to persons with authority. Requiring notices would prevent the court from concentrating on the substance of the federal mandate —accessibility— and would place procedural obstacles on the exercising of rights.

j. Establishing and managing a business requires compliance with many laws and standards. That is the cost of doing business. Those who decide to operate a place of public accommodation must comply with the applicable laws from the very first day. Anyone who decides to operate a place of public accommodation that from day one excludes or limits access to persons with disabilities acts on their own accord. It is unthinkable that anyone would seek to delay (by requiring "notices") or eliminate consequences for small or large enterprises that fail to pay taxes or that do not comply with the health and safety codes. Violating the rights of persons with disabilities must not be treated any differently. It is also unacceptable that "large" companies be required to comply while medium-size or small companies are not required to do so (or vice-versa), or that compliance be required depending on the place of incorporation of the company or on the national origin or race of the owners or shareholders of the company or business.

k. There are large federal initiatives to educate business owners

about their obligations under the ADA, including the detailed website of the U.S. Department of Justice on ADA compliance (ada.gov), the direct line of the Department of Justice, extensive technical assistance materials provided by the Department of Justice, and the ten regional ADA centers financed by the federal government that provide in-depth resources and training in every state (adata.org). However, the Respondents have made no significant or proactive effort to comply with the ADA.

l.   Based on their historic failure to comply and the nature of the non-compliance, the Petitioner believes that the Respondents have never acknowledged that the ADA accessibility standards are extremely important. Said standards are not minor details or demanding rules; instead, they are essential to guaranteeing true accessibility. A door that is too narrow can make the difference between entering or not entering a business. A restroom with too little space can make the difference between using or not using the restroom. This being said, it is important to point out that in order to impose liability under the ADA, the barrier does not need to fully exclude the Petitioner from entering or using the facility; it need only *interfere* with the Petitioner's full and equal enjoyment of same. The ADAAG sets forth technical standards required for "full and equal enjoyment". Therefore, if a barrier violates the ADAAG and said barrier is related to the Petitioner's disability, the Petitioner's equal and full access is affected, which constitutes discrimination under the ADA.

m.   We know that persons with disabilities experience a loss of dignity, independence, personality, and pride associated with segregation and the lack of access to public accommodations. Beyond the

Price Tag: An Economic Analysis of Title III of the Americans with Disabilities Act. 20 Kan. J. L. & Pub. Pol'y 58, 76, 85 (Fall 2010). Accessibility barriers and segregation create social stigma and erode the self-esteem and independence of persons with disabilities. Stacey Menzel Baker, Jonna Holland and Carol Kaufman-Scarborough, How Consumers with Disabilities Perceive "Welcome" in Retail Servicescapes: A Critical Incident Study. 23 J. of Serv. Marketing 160,167-168 (2007). Barriers also cause persons with disabilities to have an overall negative reaction to any retail environment, and to experience fear and discomfort in said environment. Carol Kaufman-Scarborough, Reasonable Access for Mobility-Disabled Persons is More Than Widening the Door. 75 J. of Retailing 479, 483, 494 (1999). See also, The Routledge Handbook of Designing Public Spaces for Young People: Processes. Practices and Policies for Youth Inclusion (2020) (discussing the concept of access to a substantially similar experience, beyond physical access, from a scientific perspective); Moreno Llopis, Beatriz. La arquitectura al servicio de la discapacidad funcional. Diss. 2020; Cruz, Vanessa Vianna, et al. "Accessibility barriers for people with disabilities or reduced mobility: an integrative review." Research, Society and Development 9.4 (2020): 168943053; Carol Kaufman-Scarborough and Stacey Menzel Baker, Do People with Disabilities Believe the ADA Has Served Their Consumer Interests?. 39 J. of Consumer Aff. 1, 24 (Summer 2005); Baker, Stacey Menzel, Jonna Holland, and Carol Kaufman-Scarborough. How consumers with disabilities perceive "welcome" in retail servicescapes: a critical incident study. Journal of Services Marketing (2007); Realm, Public.

[CERTIFIED TRANSLATION]

Experiential Accessibility. Inaccessibility in the web is also one of the great modern challenges. Cohen, Alex H., Jorge E. Fresneda, and Rolph E. Anderson. What Retailers Need To Understand About Website Inaccessibility And Disabled Consumers: Challenges And Opportunities. Journal of Consumer Affairs.

n.  The Petitioner vehemently rejects arguments stating that enforcing the ADA privately is not valid. The law must be observed regardless of whether the place of public accommodation is a small, medium or large entity. The ADA does not allow discriminating against some but not others. The prohibition of discrimination is absolute and applies equally to everyone. No distinction is made on the basis of the social or national origin, citizenship, or legal residence of the person who operates a place of public accommodation, whether it be a natural person or a legal entity. Complying with the physical accessibility standards of the ADA requires that business owners take proactive measures and, often, incur costs. Unfortunately, in this case, neither the law nor the possibility of being faced with a civil action (by the government or by a private party) was incentive enough to stimulate voluntary compliance. The ADA was not enough to compel the Respondents to comply with the law and the objective of this Petition is to ensure compliance with what is mandated by law.

**SECOND CAUSE OF ACTION**
**REHABILITATION ACT OF 1973**
(Section 504, 29 U.S.C. § 701 et seq.)

48.  The preceding paragraphs are incorporated herein by reference.

49.  Section 504 provides that: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits

Case 3:21-cv-01350-MEL   Document 1-3   Filed 07/30/21   Page 29 of 37
[CERTIFIED TRANSLATION]
SJ2021CV03293 28/05/2021 08:07:58 pm Entry No. 1 Page 34 of 34

of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a).

50.   The Petitioner is eligible to receive the benefits and services that are made available to the public at the Property.

51.   The CARES Act authorizes the Small Business Administration (SBA) to provide temporary financial assistance to eligible entities. Specifically, Section 1102 of the CARES Act established the Paycheck Protection Program (PPP) which broadened the SBA's authority to guarantee loans under section 7(a) of the Small Business Act. Section 1110 of the CARES Act broadened the SBA's authority to distribute loans known as Economic Injury Disaster Loans (EIDL) under section 7(b)(2) of the Small Business Act. In short, this means a loan may be taken that does not have to be repaid later.

52.   As a matter of course, the direct receipt of federal funding imposes some obligations on the beneficiaries. For example, multiple civil rights laws impose obligations on the people who receive federal funding. Among them, Title VI of the Civil Rights Act of 1964 and, relevant herein, Section 504 of the Rehabilitation Act, which prohibits discrimination based on disability. Likewise, SBA regulations also prohibits entities who receive federal funding from discriminating based on certain protected categories, including disability. 13 C.F.R. Section 112, which implements Title VI; 13 C.F.R. Section 117, which implements the Age Discrimination Act; of 13 C.F.R. Section 113, Subpart A. By regulatory mandate, entities that receive federal funding have an obligation to keep records and produce reports of

SJ2021CV03293 28/05/2021 08:07:58 pm Entry No. 1 Page 34 of 34

compliance with these requirements when requested; they must also allow access to these records and to the premises. People may also file complaints with the SBA and, if the investigation reflects noncomplaince with the applicable requirements, the SBA may suspend bendefits, accelerate the repayment of the debt, or require the return of federal funding.

53. The Petitioner is protected by Section 504 inasmuch as he is substantially limited in his capacity of movement at the present time and also during July 29, 2020, and January 21, 2020.

54. During the last year, and up to the present, the Respondents and the Property have received federal funding as part of its programs and activities. These federal funds, among others, [sic] based on the funds from the aforementioned CARES Act and PPP. It is believed, and shall be an object of discovery, that federal funding has also been received from other sources and federal programs.

55. During the past four years, and also during the last year, The Respondents and the Property operated a program or activity that is covered by the Rehabilitation Act and also received federal funding as part of their programs and activities.

56. The Respondents' behavior described in this allegation violated the Petitioner's rights under the Rehabilitation Act by excluding the Petitioner or denying him benefits only because of his disability.

57. The Respondents' behavior reveals a deliberate indifference towards the rights of the Petitioner, inasmuch as the Respondents were aware or should have been aware of their legal obligations under the

federal legislation, yet they consciously ignored said obligations.

58. The Petitioner suffered emotional anguish and damages as a result of the Defendants' violation of the Rehabilitation Act.

59. Pursuant to Section 505 of the Rehabilitation Act, the Plaintiff is entitled to compensation for damages, costs, litigation expenses, and attorney's fees.

60. In accordance with the ruling of the United States Supreme Court in *Uzuegbunam v. Preczewski.* 592 U.S._____(2021), 2021 WL 850106 (March 8, 2021),[6] we request nominal damages. In *Uzuegbunam* ,a student was banned from preaching at the University of Georgia campus when he was a student. In an 8-1 decision in *Uzuegbunam,* the United States Supreme Court concluded that Chike Uzuegbunam could claim nominal damage from Georgia Gwinnett College, even when the university changed its discriminatory policy in response to the civil action brought by him. Judge Clarence Thomas penned the majority opinion and Justices Samuel Alito, Stephen Breyer, Amy Coney Barret, Neil Gorsuch, Elena Kagan, Brett Kavanaugh, and Sonia Sotomayor also joined in the majority opinion that put an end to the practice of *"tactical mootness"* in the context of federal causes of action. Said practice consists of alleging that a violation of rights has become moot in order to then move for the dismissal of the entire suit. Although a claim for injunctive relief can become moot if all of the requirements of the doctrine and is exceptions are met, the claim can still remain alive through a claim for

---

[6] See https://www.siipremecourt.eov/opinionsQOptl1719-968 8ni9.pdf

nominal damages. Nominal damages represent a concrete victory for the claimant and also serve as the basis to determine who is the prevailing party in the civil proceeding. In this case, nominal damages are requested under (i) the ADA and (ii) the Rehabilitation Act.

## LEGAL REMEDIES REQUESTED

**WHEREFORE**, the Petitioner very respectfully requests the following legal remedies:

A.   A declaratory judgment providing that the Respondents have breached the requirements of the Rehabilitation Act of 1973 and Title III of the ADA and the corresponding implementation regulations of the ADA; and that the Property is not fully accessible and able to be used independently by persons with limited mobility, such as the Petitioner.

B.   A permanent statutory injunction in accordance with 42 USC § 12188 (a) (2) and 28 CFR § 36.504 (a) ordering the Respondents to take all the steps necessary to eliminate the architectural barriers described herein and so that their facilities comply with the requirements established in the ADA and its implementation regulations, so that their facilities are fully accessible to, and may be independently accessed by, persons with limited mobility, as well as an order stating that the court shall retain jurisdiction for a period to oversee that the Respondents comply with the relevant requirements of the ADA and to make sure that the Respondents have adopted and follow an institutional policy that actually makes them remain fully in compliance with the law.

C.   In the event that the Respondents continue with their discriminatory conditions,

it is hereby requested in accordance with 42 USC § 12188 (a) (2) and 28 CFR § 36.504 that the closing and closure of the Property be ordered as a measure to stop the discriminatory conditions until the Respondents have irrefutably shown to the satisfaction of the court that the discrimination has been eliminated.

D.     Compensatory damages pursuant to the Rehabilitation Act.

E.     Nominal damages for the amount of one dollar for two complete and independent grounds: (1) violation to the Rehabilitation Act; (2) violation to the Americans with Disabilities Act. Nominal damages are not available for state-level causes of action but it it is available for federal-level causes of action, and nominal damages are requested expressly as established in Uzuegbunam v. Preczewski, 592 U.S. ___ (2021).

F.     Payment of costs and litigation expenses, in accordance with 42 USC § 12205.

G.     Payment of reasonable attorney's fees *not* under the Puerto Rico Rules of Civil Procedure, but pursuant to the provisions of 42 U.S.C. § 12205 and 28 CFR § 36,505[sic] and its binding and interpretative case authority; and

H.     The provision of any other remedy that is just or proper, in law or equity, which has not been expressly requested but is warranted as a matter of law.

**RESPECTFULLY SUBMITTED**

Today, May 28, 2021.

s/José Carlos Vélez Colón
ATTY. JOSÉ CARLOS VÉLEZ COLÓN

[CERTIFIED TRANSLATION]

ATTORNEY REGISTRY NO,: 18913
JVELEZ@VELEZLAWGROUP.COM

421 AVE MUÑOZ RIVERA #205,
SAN JUAN, PR 00918

TEL.: (787) 599-9003
FAX: N/A

Counsel for the Petitioner

---

**CERTIFICATE OF TRANSLATION INTO ENGLISH**

DOCUMENT CERTIFIED: PETITION FOR ORDER FOR PERMANENT INJUNCTION, consisting of 34 pages.

I, Enith M. Valdés, a certified interpreter by the Administrative Office of the United States Courts, do hereby certify that this document is a true and accurate translation of its original.

In San Juan, Puerto Rico, today, July 28, 2021.

LINGOVOX TRANSLATION STUDIO
165 Hostos Ave, San Juan Puerto Rico 00918
787-800-9903                                                                          12421-106

---

[CERTIFIED TRANSLATION]

## COMMONWEALTH OF PUERTO RICO
## COURT OF FIRST INSTANCE
## SUPERIOR COURT, SAN JUAN PART

| | |
|---|---|
| DAVID FIGUEROA | **CIVIL CASE NO. SJ2021CV3293** [hw: (806)] |
| **Petitioner** | |
| v. | **IN RE:**<br>**PETITION FOR ORDER; DAMAGES** |
| BOARD OF HOMEOWNERS OF THE EXECUTIVE TOWER CONDOMINIUM, BANCO COOPERATIVO DE P.R., JOHN DOES 1–100<br>Respondent | |

### SUMMONS

UNITED STATES OF AMERICA,  SS
PRESIDENT OF THE UNITED STATES
COMMONWEALTH OF PUERTO RICO

**TO:    BANCO COOPERATIVO DE P.R.**


YOU ARE HEREBY summoned to file with the court a responsive allegation within **30** days after being served with this summons, excluding the day of service. You must file your responsive allegation through the Unified Case Management and Administration System (SUMAC, Spanish acronym), which you can access by using the following electronic address: https://unired.ramajudicial.pr, unless you are representing yourself, in which case you must file your responsive allegation with the office of the court's clerk.  If you fail to file your responsive allegation within said term, the court may hand down a default judgment against you and grant the remedy requested in the complaint, or any other remedy, if the Court, in exercising its sound discretion, believes that such remedy is warranted.


Name of Attorney:    JOSÉ CARLOS VÉLEZ COLÓN (Sole Registry of Attorney's: 18913)
Address:        421 MUÑOZ RIVERA AVE., APT 1009, SAN JUAN,
            PUERTO RICO 00918-4015
            Tel: 7875999003
E-mail:        JVELEZ@VELEZLAWGROUP.COM

Issued under my signature and the seal of the court, on   [ink stamp: JUNE (illegible), 2021]   .

[round ink stamp: Commonwealth of Puerto Rico, General Court of Justice, Court of First Instance, Superior Court, San Juan Part (initialed)  K089]

[ink stamp: (illegible) Caguas
Office of (illegible)
Received:      4/13/21
Date:         (illegible signature)
Time:        2:59 pm]        ]

[ink stamp: Griselda Rodríguez Collado
Regional Clerk]
[illegible]
Regional Clerk
[ink stamp: Awilda Calderón Rodríguez] [initialed]
By:        Deputy Clerk
Name and Signature of
the Deputy Court Clerk

[CERTIFIED TRANSLATION: SUMMONS ADDRESSED TO BANCO COOPERATIVO]

## **PROOF OF SERVICE OF SUMMONS**

### **CASE NO.: SJ2021CV3293**
David Figueroa v. Banco Cooperativo de P.R.

I,   _[hw: Jessica I. Díaz ]_                declare that I have the legal capacity pursuant to Rule 4.3 of the Puerto Rico Rules of Civil Procedure and I certify under my signature and oath that the service of the **SUMMONS and PETITION (hereinafter "COMPLAINT")** in the above-referenced case was done by me as indicated below:

1.      **DATE** of the service of summons:   _[hw: June 30, 2021  10:30 am]_            .

2.`     **PLACE or ADDRESS** where the summons was delivered along with a copy of the Complaint.   _[hw: Metro Office Park_
        _Lot 4, 1st Street, Suite 500_
        _Guaynabo, P.R. 00968]_

3.      **MODE OR FORM OF DELIVERY**  I personally delivered a copy of this summons and a copy of the Complaint to the person indicated below, who said he/she is authorized to receive summons on behalf of the person named on the back, pursuant to Rule 4.4 of the Puerto Rico Rules of Civil Procedure.

4.      **THE NAME OF THE AUTHORIZED PERSON WHO RECEIVED THE SUMMONS IS:**
        **[hw: Maria L. Vila]**
        _[-Summons_
        _-Complaint_
        _-Appendix A, B, C were_
        _delivered to her]_

5.      SIGNATURE OF THE SUMMONS SERVER:   ___[illegible signature]_____

*********************************************************************************************************

### **PROCESS SERVER'S STATEMENT**
### **(BEFORE THE COURT CLERK)**

I declare under penalty of perjury, in accordance with the laws of the Commonwealth of Puerto Rico, that the information provided above in the service of summons is true and correct.

**AND IN WITNESS WHEREOF**, I sign this document in _____,   Puerto Rico,   today, _____, **2021**.

_____
                                    **Signature of Process Server**

Sworn  to  and  signed  before  me  by  _____whose  personal information is indicated above, whom I attest to having identified via the following personal information since I do not know him/her personally.

In _____, Puerto Rico, on _____, 2021.

_____
                                    **AUTHORIZED OFFICIAL**

[CERTIFIED TRANSLATION: SUMMONS ADDRESSED TO BANCO COOPERATIVO]

---

**CERTIFICATE OF TRANSLATION INTO ENGLISH**

**DOCUMENT CERTIFIED: SUMMONS ADDRESSED TO BANCO COOPERATIVO, consisting of 2 pages.**

I, Enith M. Valdés, a certified interpreter by the Administrative Office of the United States Courts, do hereby certify that this document is a true and accurate translation of its original.

In San Juan, Puerto Rico, today, July 28, 2021.

LINGOVOX TRANSLATION STUDIO
165 Hostos Ave, San Juan Puerto Rico 00918
787-800-9903                                                      12421-106

---